In re D & L NICOLAYSEN, Debtor.

Wells Fargo Bank, N.A., a national banking association, Plaintiff,

v.

D & L Nicolaysen, Defendant.

Bankruptcy No. 91–92771–A–11.
Adversary No. 97–9333.

United States Bankruptcy Court,
E.D. California,
Modesto Division.

July 21, 1998.

Desmond Cussen, Gibson, Dunn & Crutcher, San Francisco, CA, for Plaintiff.

Michael L. Abbott, Modesto, CA, for Debtor.

## MEMORANDUM DECISION

MICHAEL S. McMANUS, Bankruptcy Judge.

Plaintiff Wells Fargo Bank has filed two adversary proceedings in two related chapter 11 cases seeking a determination that it is entitled to payment of Retain Certificates issued by a agricultural cooperative association to the defendants with a face value of

$568,000.00. The court, after considering the terms of the confirmed chapter 11 plans, the testimony, and other exhibits, concludes that the Wells Fargo Bank is not entitled to the relief it seeks.

### I. Facts

Beginning in 1986, Wells Fargo Bank made a series of secured loans to Nicolaysen Farms which were guaranteed by D & L Nicolaysen. These loans were last restructured on April 17, 1990 pursuant to a Restructuring Agreement.

Despite the restructure, Nicolaysen Farms and D & L Nicolaysen (the Debtors) defaulted on the loans and sought refuge under chapter 11 to prevent Wells Fargo Bank from foreclosing upon its collateral. Both Debtors filed a voluntary petition on August 9, 1991. In its bankruptcy schedules, Nicolaysen Farms listed, among many other assets, "Certificate of Membership Nulaid Foods, a cooperative association," at a value of $158,000.00. D & L Nicolaysen likewise scheduled a "Certificate of Membership Nulaid Foods, a cooperative association," but with a value of $410,000.00 (collectively "the Retain Certificates").[1]

Retain certificates represent monies owed by an agricultural cooperative association to a member farm producer which are paid to the farm producer on a delayed basis in order to assure that the cooperative association has sufficient working capital to fund its operations.

On July 10, 1992, Michael McGranahan was appointed the chapter 11 trustee in both cases. He operated the Debtors' businesses and unsuccessfully attempted to liquidate the assets of the estates prior to confirmation of plans.

In connection with the confirmation of chapter 11 plans in each of these cases, the secured claim of Wells Fargo Bank was allowed in the amount of $9,479,884.00.[2] Its collateral was valued at $13,976.00.[3] Because

---

1. In both cases, the Retain Certificates were listed on Schedule A at item # 12 which identifies "Stock interests in incorporated and unincorporated businesses."

2. This amount included all interest through May 7, 1993. Exhibit 6, Findings of Fact and Conclusions of Law, ¶ 18–25.

3. The real property collateral of Wells Fargo Bank was valued at $11,040,300.00. There were

its claim was over-collateralized and because its loan documentation provided for payment of bankruptcy and litigation expenses, the court also ordered that "Wells Fargo's Allowed Secured Claim shall include amounts owed for attorneys fees, appraisal fees, and other expenses as provided in the loan agreements as are found by the Court to be reasonable after notice and hearing."[4] 11 U.S.C. § 506(b).

On March 13, 1995, after notice and a hearing, the court ordered payment of $292,971.00 on account of Wells Fargo Bank's legal fees, appraisal fees and other litigation expenses. At the time of this award, Wells Fargo Bank had incurred $767,863.53 in such expenses, but there was only $292,971.00 available to pay Wells Fargo Bank. Wells Fargo Bank now requests the court approve the remaining expenses as well as its additional expenses incurred since March 13, 1995, in connection with the various appeals pursued by the Debtors. Its unpaid legal fees, appraisal fees, and other litigation expenses now total $539,057.52.

The court not only previously determined the amount of Wells Fargo Bank's secured claim, it also concluded that "[a]ll liens asserted by Wells Fargo in the Assets of [the Debtors were] valid, duly perfected and not subject to avoidance, limitation, invalidation or charges pursuant to any applicable federal or state law...."[5]

These prior determinations and the evidence produced by Wells Fargo Bank in this adversary proceeding establish that its claim was secured, was over-collateralized, and was not subject to any objection. However, no evidence itemizing Wells Fargo Bank's prepetition personal property collateral was produced at trial. The court's prior orders and findings found only that whatever security interest existed was enforceable in these cases. Also, nowhere in the complaint does Wells Fargo Bank assert that it has a security interest in the Retain Certificates.

On September 7, 1993, the court confirmed a plan of reorganization proposed jointly by Wells Fargo Bank and a committee of growers ("the Joint Plan"). The Joint Plan placed Wells Fargo Bank's secured claim in class 2 and described it as "the Secured Claim of Wells Fargo Bank, N.A. secured by first priority (except as otherwise indicated) Liens in [ten specified real properties of the Debtors] and various assets related thereto...."[6]

Section 4.3(b) of the Joint Plan prescribed the treatment of Wells Fargo Bank's secured claim. The claim was to be "paid from the proceeds received at the Bankruptcy Sale of the Debtors' Real Properties and *Equipment* in which Wells Fargo ha[d] a security interest," after payment to any senior lienholders. (Emphasis added.)[7] "Bankruptcy Sale" refers to "the sale of the Debtors' Real Properties and Personal Property held pursuant to Section 363 of the Bankruptcy Code and

---

senior liens of $1,154,028.00. Exhibit 6, Findings of Fact and Conclusions of Law, ¶ 11. Exhibit 7, Application of Wells Fargo Bank, N.A. for Turnover of Remaining Estate Cash in Partial Payment of Professional Fees, p. 10. Thus, after deducting senior liens, the court previously determined that Wells Fargo Bank's real property had a net value of $9,886,272.00. Its personal property collateral had a value of $2,936.592.00.

4. Exhibit 5, Order Confirming Joint Plan, ¶ 15.

5. Exhibit 5, Order Confirming Joint Plan, ¶ 16. This determination, however, was subject to the right of the principals of the Debtors to contest the validity and scope of Wells Fargo Bank's liens in certain post-petition crop income. Also, the reference to "Assets" is from the Joint Plan. Section 1.4 of the Joint Plan provides: " 'Assets' shall mean all of the right, title and interest of any of the Debtors in and to property or whatsoever type or nature including property as defined in Section 541 of the Bankruptcy Code. Assets

shall include all Real Property and Personal Property of Debtors." Exhibit 4, Joint Plan, § 1.4.

6. Exhibit 4, Joint Plan, § 2.2(b). The "various assets related" to the ten real properties are not described in the Joint Plan. From the context, this would appear to refer to fixtures on the ten real properties. There is no reference in section 2.2(b) to any personal property collateral.

7. The fact that first letter of "Equipment" in section 4.3(b) of the Joint Plan is capitalized suggests that it is a defined term. Definitions are contained in Article I of the Joint Plan. Article I does not define "Equipment." Section 1.48 defines "Personal Property" as "cash, accounts receivable, rights to payment, notes, inventory, crops, equipment, automobiles, and all proceeds therefrom...."

described in Article VII of the Plan."[8] Article VII required the Bankruptcy Sale to be a public auction.[9]

From sections 1.10, 7.1(b), 7.2(b) [definition of "Bankruptcy Sale"], 1.48 [definition of "Personal Property"], and 4.3 [treatment of Wells Fargo Bank's secured claim] of the Joint Plan, two conclusions can be drawn. First, the Joint Plan limited Wells Fargo Bank's security interest in personal property to equipment. No additional security interest in the Retain Certificates, in particular, or in rights to payment, accounts receivable, notes, general intangibles, or contract rights, in general, was granted, created, continued, recognized, or provided to Wells Fargo Bank under the terms of in the Joint Plan. And, as noted above, Wells Fargo Bank failed to produce any evidence at trial indicating that it held a pre-petition security interest in any particular personal property of the Debtors.

If, however, Wells Fargo Bank had an enforceable pre-petition security interest in the Retain Certificates, the relevant facts do not change. The order confirming the Joint Plan provided that "[a]ll of the liens to be recognized, continued, or created in favor of the secured creditors of the Debtors under the Plan are deemed valid and perfected on, and to have a priority as of, the date of the original perfection *if such lien is recognized and confirmed under the Plan* without any further action required and without any requirement of filing or recording financing statements, deeds of trust, mortgage or other

evidence of such liens."[10] (Emphasis added.) That is, because the plan did not provide for the continuation of a security interest in the Retain Certificates, no such security interest encumbered the Retain Certificates after confirmation of the Joint Plan.[11] *See* 11 U.S.C. § 1141(c).

Second, even though Wells Fargo Bank did not receive or retain a security interest in the Retain Certificates under the Joint Plan, the Retain Certificates were to be sold at a "Bankruptcy Sale."[12] Section 7.2(b) of the Joint Plan expressly required the liquidation of all "noncash Personal Property" at the Bankruptcy Sale. "Personal Property" included all accounts receivable, notes, and rights to payment.[13] The proceeds received at auction for the equipment were to be paid to Wells Fargo Bank. The proceeds generated from the sale of all other noncash personal property were to be used to pay the claims of general unsecured creditors,[14] a possible deficiency claim held by Wells Fargo Bank,[15] and the debt claims of insiders of the Debtors.[16]

The order confirming the Joint Plan permitted Wells Fargo Bank "to seek a deficiency claim from the Court, if after the completion of the Bankruptcy Sale, the Court determines that Wells Fargo has a deficiency in accordance with applicable law and after all allowed Claims in Class 11 [general unsecured creditors] have been paid in full."[17] Because all class 11 claims were paid in full, and because the Retain Certifi-

---

8. Exhibit 4, Joint Plan, § 1.10.

9. Exhibit 4, Joint Plan, §§ 7.1(b) & 7.2(b).

10. Exhibit 5, Order Confirming Joint Plan, ¶ 17.

11. This conclusion is supported by the wording of section 7.2(c) of the Joint Plan. Exhibit 4, Joint Plan, § 7.2(c). It states: "The proceeds from the sale of equipment in which Wells Fargo has a security interest shall be paid to Wells Fargo in partial satisfaction of its Secured Claim against the Debtors.... The proceeds from the sale of the remaining Personal Property shall become Estate Cash and shall be distributed by the Liquidating Agent to the Holders of Allowed Claims in accordance with their rights under the terms of the plan."

12. Exhibit 4, Joint Plan, § 1.10. See also n. 21, *infra*.

13. Exhibit 4, Joint Plan, § 1.48.

14. General unsecured claims are classified in class 11 of the Joint Plan. Exhibit 4, Joint Plan, § 2.1(k). *Also see* n. 11, *supra*.

15. Exhibit 5, Order Confirming Joint Plan, ¶ 4(b). This provision of the order replaced the provisions in the Joint Plan providing for a deficiency claim. Exhibit 4, Joint Plan, § 4.3(d).

16. The debt claims of insiders are classified in class 13 of the Joint Plan. Exhibit 4, Joint Plan, § 2.1(m).

17. Exhibit 5, Order Confirming Joint Plan, ¶ 4(b).

cates were not encumbered by a security interest in favor of Wells Fargo Bank, if the Retain Certificates can still be sold under the terms of the Joint Plan, the sale proceeds must be distributed first to Wells Fargo Bank on account of any deficiency claim, then to insiders, and then to the equity security holders of the Debtors.[18]

Michael McGranahan, the chapter 11 trustee, was appointed the Liquidating Agent. Under the Joint Plan he had the power and duty to marshal and liquidate virtually all of the Debtors' real and personal property, and to distribute the sale proceeds in accordance with the Joint Plan.[19] Although all real and personal property of the Debtors re-vested in the Debtors upon confirmation of the Joint Plan, the Debtors were prohibited from asserting any control over their assets:

"From and after the Confirmation Date, the Liquidating Agent shall operate and maintain the Debtors' [the real and personal property] pending the Bankruptcy Sale. The Debtors shall be prohibited and enjoined from operating and disposing of

any interest in [the real and personal property] pending the Bankruptcy Sale."[20]

As already noted above, the Liquidating Agent was to conduct a "Bankruptcy Sale" or auction of all real property and all personal property other than cash but including all rights to payment.[21] These two auctions were to be conducted forty-five days after the effective date of the Joint Plan "or as soon as possible thereafter."[22] The Liquidating Agent sold all personal property, other than the Retain Certificates, at an auction conducted on November 6, 1993.[23] On November 9, 1993, all real properties were sold at auction.[24] The Liquidating Agent thereafter distributed the sale proceeds to the creditors.

The Liquidating Agent was aware of the Retain Certificates even though he did not liquidate them. Before becoming the Liquidating Agent, Mr. McGranahan was the chapter 11 trustee in both cases. As the trustee, he surely reviewed the schedules and noted that the Debtors had listed "Certificates of Membership" in Nulaid Foods with a combined value of $568,000.00.

---

**18.** Exhibit 4, Joint Plan, §§ 4.12–4.15; Exhibit 5, Order Confirming Joint Plan, ¶ 4.

**19.** Exhibit 4, Joint Plan, §§ 1.10, 1.41, 7.1, 7.2, 7.3, 7.4.

**20.** Exhibit 4, Joint Plan, § 7.7; *also see* § 7.1(a) [real property] and 7.2(a) [personal property].

**21.** Exhibit 4, Joint Plan, §§ 1.24, 1.48, 7.2(b) & 7.3. In addition to the express requirement of section 7.2(b) that all "noncash Personal Property" be sold at the Bankruptcy Sale, section 7.3 of the Joint Plan limited the Liquidating Agent's power and authority to take possession of, manage, and maintain the Debtors' real property and personal property to the period prior to the Bankruptcy Sale. There is no general or specific grant of authority to collect accounts receivable and other rights to payment after the Bankruptcy Sale. Additionally, the definition of Estate Cash is drawn such that the only cash the Liquidating Agent could collect was cash on hand prior to the Bankruptcy Sale and cash from the sale of assets at the Bankruptcy Sale. This indicates to the court that rights to payment, such as is represented by the Retain Certificates, were to be sold at the Bankruptcy Sale and not collected by the Liquidating Agent from the obligor.

**22.** Exhibit 4, Joint Plan, §§ 7.1(b) & 7.2(b).

**23.** On September 26, 1994, the Liquidating Agent filed an application for compensation in which he stated: "I have completely liquidated all assets to cash and made distribution of cash to all creditors of the estate except payments on 'Insider Claims,' 'Equity Interest Claims' and the Deficiency Claim of Wells Fargo." The Liquidating Agent's October 14, 1994, final accounting reveals that the auctioneer paid the proceeds from the sale of personal property to the Liquidating Agent on November 30, 1993. In neither document does the Liquidating Agent disclose the date(s) the Bankruptcy Sale was conducted. However, in a declaration filed in this court on February 25, 1994, and in the District Court in connection with a motion to dismiss two appeals from the orders confirming the Joint Plan, the Liquidating Agent disclosed that there were two auctions, one of personal property and one of real property. The court takes judicial notice of the Declaration of Michael D. McGranahan filed in support of the motion to dismiss the appeals.

**24.** The Liquidating Agent's October 14, 1994, final accounting reveals that only one of the several real properties owned by the Debtors was sold to a third party. Because no one bid the minimum amounts required by the Joint Plan for the other real properties, they were transferred to Wells Fargo Bank for the credit bid amounts also set by the Joint Plan. Exhibit 4, Joint Plan, §§ 7.1(c)–(d).

Also, the Liquidating Agent admits he was aware of the Retain Certificates. He testified:

"At or around the time of the hearing on confirmation of the plan of reorganization which had been co-proposed by Wells Fargo Bank and the committee of growers, (i.e., approximately the summer of 1993), I did hear about the possible existence of the certificates (I do not recall the source of the information). As a result, I wrote a letter to Nulaid seeking further information with respect to the certificates. Nulaid did not answer this letter." [25]

The Liquidating Agent has not explained why he took no further action when Nulaid failed to respond to his letter. There is also no evidence that Mr. McGranahan, either as the chapter 11 trustee or as the Liquidating Agent, ever made demand on the Debtors or their principals for turnover of the Retain Certificates. It appears, then, that the Liquidating Agent, as well as Wells Fargo Bank, simply forgot about this asset.

On April 11, 1996, the court served a notice of its intention to enter a final decree and close the chapter 11 cases. [26] May 11, 1996, was set as the last date to request a hearing on the notice. No party requested a hearing. On July 23, 1996, the court signed a final decree. On July 29, 1996, the clerk closed the case.

Wells Fargo Bank maintains that sometime in the Fall of 1997, it re-discovered the Retain Certificates. On October 3, 1997, it moved to reopen the cases to administer the Retain Certificates. On October 27, 1997, the cases were reopened.

## II. Discussion

Wells Fargo Bank asserts that the Retain Certificates should be turned over to it to partially satisfy the remainder of its claim, consisting of $539,057.52 in unpaid legal fees and other litigation costs. The Debtors counter that they should receive the Retain Certificates because (1) the Retain Certifi-

cates were never property of the estate; (2) the Retain Certificates were abandoned when the cases were closed; and (3) the doctrine of laches bars Wells Fargo from collecting the Retain Certificates.

This proceeding involves the interpretation and enforcement of a confirmed chapter 11 plan. Consistent with 11 U.S.C. § 1141 and 28 U.S.C. § 1334(b), the chapter 11 plan expressly provided for this court's continued jurisdiction to construe and enforce the plan. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A), (B), & (O).

### A.

Before these issues are addressed, however, it must first be determined whether Wells Fargo Bank's demand for $539,057.52 is reasonable. [27]

The Debtors have offered no evidence or argument that the litigation expenses incurred by Wells Fargo Bank during the course of these bankruptcy cases are unreasonable. The court's review of the fees and expenses leads it to conclude that a similarly situated secured creditor could have reasonably incurred similar litigation expenses. *In re Kord Enterprises II*, 139 F.3d 684, 689 (9th Cir.1998).

The court has previously found that Wells Fargo Bank's legal and other expenses are provided for under its loan documentation. It also found that on the date of confirmation of the Joint Plans, Wells Fargo Bank was secured and over-collateralized. Provided there is sufficient cash, Wells Fargo Bank is entitled to payment of its expenses. *Id.*

The court does not conclude, however, that Wells Fargo Bank is secured by the Retain Certificates. As noted above, the Joint Plan did not provide for such a security interest. The unpaid expenses, therefore, represent a deficiency claim within the meaning of the order confirming the Joint Plan. This deficiency claim was entitled to payment pursu-

---

**25.** Alternative Direct Testimony Declaration of Liquidating Agent, ¶ 4.

**26.** The Liquidation Agent's final accounting was filed on October 14, 1994. The cases were closed on July 23, 1996. The approximate two-year gap is explained by the pendency of appeals

by the Debtors from the orders confirming the Joint Plan. Those appeals were rejected by the Ninth Circuit on February 6, 1996.

**27.** Exhibit 5, Order Confirming Joint Plan, ¶ 15.

ant to the Joint Plan after payment in full of all general unsecured claims but before payment of the claims of insiders.

Must the Retain Certificates be used to satisfy this deficiency claim?

### B.

The Debtors first argue that the Retain Certificates cannot be used to pay Wells Fargo Bank's deficiency claim because the certificates were never property of the estates. This argument is without any merit.

■ First, it is undisputed that the Retain Certificates represent a right of the Debtors to the payment of money. These rights had accrued and were in existence when the Debtors filed their petitions.[28] Therefore, the Retain Certificates were legal or equitable interests and constituted property of the estate. 11 U.S.C. § 541(a)(1).

■ Second, the Debtors, a corporation and a partnership, were ineligible to claim the Retain Certificates or any other assets as exempt. Only individual debtors may exempt property of the estate. 11 U.S.C. § 522(b).

■ Third, although an asset without monetary value is nonetheless property of the estate, the Retain Certificates had and have value. In fact, the Debtors scheduled them at a value in excess of $500,000. If they became more valuable during the case, the increase in value inured to the benefit of the estates. *In re Hyman,* 967 F.2d 1316, 1321 (9th Cir.1992).

While the Debtors' asserted in their answers that the Retain Certificates were not property of the estate, this defense was wisely deleted from their trial brief and their argument at trial. The court rejects this defense.

### C.

The Debtors also pleaded unclean hands as an affirmative defense. Their answers state that Wells Fargo Bank "acted with unclean hand in the matters described in the complaint and is therefore not entitled to any of the relief sought in the Complain[t]." The answer does not plead any specific facts supporting this defense.

Nor did the Debtors introduce any evidence at trial to support this defense. Instead, the Debtors shifted their defense to one based on the doctrine of laches.

■ When answering a complaint, a defendant must set forth affirmatively the defense of laches. Fed.R.Civ.P. 8(c) as made applicable by Fed.R.Bankr.P. 7008.[29] But all pleadings must be construed so as to do substantial justice. Fed.R.Civ.P. 8(f) as made applicable by Fed.R.Bankr.P. 7008.[30]

■ California law is to the same effect. Laches must be specially pleaded and if the answer fails to raise the defense, the court may bar evidence. 5 Witkin, *California Procedure,* 4th ed., "Pleading," § 1051, p. 501–502 (1997). But, California cases recognize the power of the court to deny relief to the plaintiff where laches is evident from the allegations of the complaint or from the evidence. *See e.g., Stevinson v. San Joaquin & K. R. Canal & Irrigation Co.,* 162 Cal. 141, 144, 121 P. 398 (1912).

■ In order to do substantial justice in this case, the court will permit the Debtors to assert a defense based upon laches even though their answer failed to plead this affirmative defense. Even so, the Debtors must clear two additional hurdles before they can prevail on this defense.

■ Laches is not a defense in this proceeding because it is not a defense to an action at law. *Brownrigg v. deFrees,* 196 Cal. 534, 539, 238 P. 714 (1925). Laches can be asserted only in a suit in equity. 11

---

28. *See* paragraphs 43 and 47 of the complaint. The allegations in these paragraphs were admitted by the Debtors. Answer, p. 2, lines 1–2.

29. Fed.R.Civ.P. 8(c) provides in part: "In pleading to a preceding pleading, a party shall set forth affirmatively ... laches ... and any other matter constituting an avoidance or affirmative defense."

30. Fed.R.Civ.P. 8(f) provides: "All pleadings shall be so construed as to do substantial justice."

Witkin, *Summary of California Law*, 9th ed., "Equity," 14, p. 691–692 (1987).

■■■ Wells Fargo Bank framed its prayer in the form of a request for declaratory relief which is generally considered an equitable remedy. But the prayer does not define whether a complaint is at law or in equity. "[L]aches is not available as a defense to an action at law [citations] even though combined with the cumulative remedy of declaratory relief. . . ." *Abbott v. City of Los Angeles*, 50 Cal.2d 438, 462, 326 P.2d 484 (1958).

A chapter 11 plan is no more than the restructuring of contractual obligations. It is a contract created by a court order rather than by the consent of the parties. *See e.g., In re Grinstead*, 75 B.R. 2, 3 (Bankr.D.Minn. 1985); *In re Depew*, 115 B.R. 965, 966 (Bankr.N.D.Ind.1989); *In re Page*, 118 B.R. 456, 460 (Bankr.N.D.Tex.1990). The obligations imposed on the parties by this contract are enforceable in an action at law. *Paul v. Monts*, 906 F.2d 1468, 1471 (10th Cir.1990).

The purpose of this adversary proceeding is to determine and enforce the rights of the parties under the Joint Plan. This proceeding seeks to enforce contract obligations and it is an action at law. Accordingly, the defense of laches is not available to the Debtors.

■■■ The foregoing notwithstanding, it would avail the Debtors nothing if the court were to deem this adversary proceeding to be a suit in equity or if it permitted the defense to be interposed in an action at law. Delay is not a bar unless it works to the disadvantage or prejudice of the other party. *Newport v. Hatton*, 195 Cal. 132, 148, 231 P. 987 (1924). Even a long delay, without some prejudice, is not laches as a matter of law. *Id.*

In this case, the Debtors have suffered no prejudice because of the delay in selling the

Retain Certificates. At trial, it was asserted that a principal of the Debtors, Donald Nicolaysen, was seventy-six years old and needed the money from the Retain Certificates. This assertion does not help the Debtors.

First, the assertion was not supported by any evidence. Second, the assertion was made with reference to a principal of the Debtors, not with reference to either of the Debtors. Mr. Nicolaysen is not a party to this adversary proceeding. Third, to the extent his age and need can be considered as prejudice, it is the same prejudice that would have been suffered had the Retain Certificates been sold three years ago. If the Retain Certificates had been liquidated three years ago and the proceeds had been disbursed to Wells Fargo Bank and other creditors, the principal would still be seventy-six years old today and his financial needs would be what they are today. Such prejudice will not sustain the defense of laches. Finally, the Debtors have taken not any action in reliance of an expectation of receiving payments based on their interests in the Retain Certificates.

Wells Fargo Bank is not barred by the doctrine of laches from requesting the relief in its complaint.

### D.

The argument that Retain Certificates cannot be used to pay Wells Fargo Bank's deficiency claim because the certificates were abandoned by operation of section 554(c) is also without merit. 11 U.S.C. § 554(c)

■■■ Unless a chapter 11 plan provides otherwise, its confirmation vests property of the estate in the debtor. 11 U.S.C. § 1141(b).[31] Although once again vested in the debtor, the former property of the estate is impressed with the obligations created by the plan. 11 U.S.C. § 1141(a) & (c).[32] That

---

**31.** Section 1141(b) provides: "Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor."

**32.** 11 U.S.C. § 1141(a) & (c) provide:
(a) . . . the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the

plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

. . . .

is, to the extent provided by the plan, the property is encumbered by the security interests of creditors. 11 U.S.C. § 1141(c). The debtor is also required to use, sell, lease, or operate the former property of the estate as required by the confirmed plan in order to satisfy the claims of creditors and equity security holders. 11 U.S.C. § 1141(a).

A bankruptcy case need not remain open while the debtor is performing a plan. Section 350(a) and Rule 3022 permit the closure of the case when it is "fully administered." Fed.R.Bankr.P. 3022; 11 U.S.C. § 350(a).[33] A case may be fully administered even though all payments to creditors have not been completed. *In re Ground Systems, Inc.*, 213 B.R. 1016, 1019 (9th Cir. BAP 1997). Rather, if payments under the plan have commenced and there are no contested matters or adversary proceedings pending or likely to be filed, the case may be closed. If it is necessary to invoke the bankruptcy court's jurisdiction after the case is closed, the case may be reopened. 11 U.S.C. § 350(b).[34]

Reconciling the foregoing with the abandonment provisions of the Bankruptcy Code has proven difficult for the parties to this adversary proceeding. Section 554(c) provides:

Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

The Debtors argue that because the cases have been closed, the operation of section 554(c) caused the bankruptcy estates to abandon the Retain Certificates to the Debtors unencumbered by any security interest of Wells Fargo Bank or any right of the Liquidating Agent to collect or sell the Retain Certificates in order to pay claims.

Wells Fargo Bank accepts the premise that section 554(c) is applicable upon the closing of a chapter 11 case. It argues, however, that the facts of this case merit a conclusion that the Retain Certificates were not abandoned to the Debtors.

Wells Fargo Bank makes four arguments. First, it maintains that re-opening of the bankruptcy case automatically undid any abandonment pursuant to section 554(c). *Figlio v. American Management Services, Inc. (In re Figlio)*, 193 B.R. 420, 424 (Bankr. D.N.J.1996); *In re Graves*, 212 B.R. 692, 695 (1st Cir. BAP 1997). Second, it asserts that because the Debtors did not accurately schedule the Retain Certificates, they were not abandoned when the case was closed. *In re Petty*, 93 B.R. 208, 212 (9th Cir. BAP 1988); 11 U.S.C. § 554(d). Third, it asserts that an abandonment under section 554(c) did not occur because the Liquidating Agent inadvertently permitted the cases to be closed without administering the Retain Certificates. *See Mele v. First Colony Life Ins. Co.*, 127 B.R. 82, 85–86 (D.D.C.1991). Finally, Wells Fargo Bank believes the court has the power to reverse any abandonment because section 554(c) provides that *"unless the court orders otherwise,* any property ... not administered ... is abandoned to the debtor...."* 11 U.S.C. § 554(c) (emphasis added). *See In re Shelton*, 201 B.R. 147, 155 (Bankr. E.D.Va.1996).

It is unnecessary, however, to address any of these arguments because the court concludes that section 554(c) has no applicability to these cases or to any chapter 11 case after a plan has been confirmed and the property of the estate has re-vested in the debtor.[35] As

---

(c) ... after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

**33.** 11 U.S.C. § 350(a) provides: "After an estate is fully administered and the court has discharged the trustee, the court shall close the case."

Fed.R.Bankr.P. 3022 provides: "After an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on

motion of a party in interest, shall enter a final decree closing the case."

**34.** 11 U.S.C. § 350(b) provides: "A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause."

**35.** *See Billington v. Hotel Mt. Lassen (In re Hotel Mt. Lassen)*, 207 B.R. 935, 938 (Bankr.E.D.Cal. 1997), for a case in which there was a confirmed plan but the plan expressly provided that the

noted above, confirmation of a chapter 11 plan results in the property of the estate vesting in the debtor unless the plan provides otherwise. The Joint Plan does not provide otherwise. Consequently, when these case were closed, no abandonment pursuant to section 554(c) was necessary or possible because the property of the estate had previously re-vested in the Debtors when the Joint Plan was confirmed.[36]

Nor does closing the case abrogate the other provisions of section 1141. Despite the closing of the case, the debtor and creditors remain bound by the terms of the plan. If the plan requires the sale of former property of the estate to satisfy claims, that requirement is not voided when the case is closed.

For these reasons, the Retain Certificates were not abandoned to the Debtors when the cases were closed on July 29, 1996. Although the Retain Certificates had previously vested in the Debtors when the Joint Plan was confirmed, the parties were and are bound to utilize the Retain Certificates as required by the Joint Plan.

### E.

 The ultimate question, then, is what does the Joint Plan require be done with the Retain Certificates at this late date?

The plan envisioned a prompt liquidation of the Debtors' assets. As already discussed in great detail above, the Retain Certificates, together with all noncash personal property and real property, were to be sold at a Bankruptcy Sale. This sale was to be accomplished by conducting two auctions, one of real property and one of noncash personal property.[37] These auctions were to be held "on the forty-fifth (45) day after the Effective Date or as soon thereafter as possible." [38]

But the Liquidating Agent has already conducted these auctions and the Joint Plan makes no provision for additional sales or auctions. For the following reasons, the court concludes that it cannot permit another sale at this late date.

First, the plain language of the Joint Plan, which was co-authored by Wells Fargo Bank's counsel, does not provide for sales of assets after the auctions of real property and noncash personal property have been conducted.[39] Wells Fargo Bank drafted a plan which forced the Debtors to accept a quick liquidation of the Debtors' assets.

Wells Fargo Bank attempts to sidestep this problem by asking the court to permit it to collect payments on the Retain Certificates directly from Nulaid. This might be appropriate if the Retain Certificates were encumbered by a security interest in favor of Wells Fargo Bank. The Joint Plan, however, provided Wells Fargo Bank with neither a security interest in the Retain Certificates nor the right to receive and retain noncash

property of the estate did not vest in the debtor upon confirmation of a plan. Consequently, the bankruptcy estate continued in existence after confirmation and property of the estate was either sold or abandoned by the liquidating agent.

**36.** One might argue that section 554(c) is nonetheless applicable because it does not mention "property of the estate." It provides for the abandonment of "property scheduled under section 521(1)." This phrase must, however, be read as referring to property of the estate. First, the schedules identify the property of the estate. Second, it would make no sense to provide for the estate's abandonment of property that is not property of the estate. There is no need to abandon property that is not property of the estate. Third, the phrase "property scheduled under section 521(1)" is undoubtedly used to make clear that property of the estate that is not scheduled is not abandoned. *See* 11 U.S.C. § 554(d).

**37.** Exhibit 4, Joint Plan, §§ 1.10, 7.1(b), 7.2(b). The definition of Bankruptcy Sale specifies "the sale" of the Debtors' real property and noncash personal property. Article VII contains separate sections for the sale of real property and the sale of noncash personal property. Section 7.1(b), dealing with the sale of real property, requires "a public auction." The Liquidating Agent was required to give notice of the auction to creditors within five days after the plan's effective date. Section 7.2(b) refers to "the Bankruptcy Sale." From these provisions it is clear there was to be either one Bankruptcy Sale or one sale of real property and one sale of noncash personal property. In fact, the Liquidating Agent conducted two auctions, one for noncash personal property and a second for real property. *See* n. 23, *supra.*

**38.** Exhibit 4, Joint Plan, §§ 7.1(b) & 7.2(b).

**39.** Exhibit 4, Joint Plan, §§ 1.10, 7.1(b), 7.2(b)

property, other than real property, in satisfaction of its debt.[40]

Second, the Joint Plan limited the Liquidating Agent's authority to manage and dispose of the Debtors' real and personal property to the period prior to the Bankruptcy Sale.[41] Once the Bankruptcy Sale was completed, the Joint Plan's injunction prohibiting the Debtors from taking control of their remaining assets dissolved.[42]

Third, the Debtors have engaged in no conduct which justifies permitting a further sale in the absence of a plan provision. They scheduled the Retain Certificates in a sufficiently clear manner to put Wells Fargo Bank and the Liquidating Agent on notice of this asset. There is no evidence that the Debtors refused to give additional information or gave false information to the chapter 11 trustee, the Liquidating Agent, or Wells Fargo Bank regarding the Retain Certificates.

The complaint alleges that the Debtors failed to turn over the Retain Certificates to the chapter 11 trustee. However, there is no evidence that he requested their possession and in the absence of such a request, there was nothing wrong with the Debtors holding the Retain Certificates. While a chapter 11 trustee is accountable for all property of the estate and is authorized to possess and use that property in order to operate a debtor's business, a debtor is obligated only to "surrender to the trustee all property of the estate...." 11 U.S.C. § 521(4).[43] *Also see* 11 U.S.C. §§ 704(1), 704(2), 1106(a)(1) & 1108. The word "surrender" generally connotes a act done by the mutual agreement of the parties. That is, the debtor must hold the property of the estate and turn it over to the trustee upon demand. 4 *Collier on Bankruptcy,* ¶ 521.12, p. 521–44 (15th ed. rev.1998) [discussion in the context of chapter 7].

Nor is there any evidence that the Debtors failed to respond a demand from the Liquidating Agent for information regarding, or possession of, the Retain Certificates. The Joint Plan did not bar the Debtors from possessing any of their assets. They were enjoined only from "operating or disposing" of their assets "pending the Bankruptcy Sale."[44]

In short, Wells Fargo Bank and the Liquidating Agent had fair and reasonable notice of the Retain Certificates. There is no evidence that the Debtors concealed them, refused a demand for their possession, or acted to prevent the Liquidating Agent from offering the Retain Certificates at the Bankruptcy Sale with all other noncash personal property.

### III. Conclusion

Even though Wells Fargo Bank has a deficiency claim of $539,057.52, the court will not grant the relief requested by Wells Fargo Bank because it is not entitled to any relief under the terms of the Joint Plan that it co-authored. It was made aware during the cases that the Debtors were entitled to payment of over $500,000.00 from Nulaid Foods. This asset was scheduled. The Liquidating Agent and Wells Fargo Bank were aware of the asset but made no demand that it be turned over to the Liquidating Agent and it was not included in the post-confirmation auction of assets. That auction was completed over three years ago and the Joint Plan does not provide for any additional sale or auction.

Judgment shall be entered for the Debtors.

---

40. Exhibit 4, Joint Plan, § 4.3(c).

41. Exhibit 4, Joint Plan, §§ 7.3(a), (q) & (f), and 7.7.

42. Exhibit 4, Joint Plan, § 7.7.

43. 11 U.S.C. § 521(4) provides: The debtor shall—.... (4) if a trustee is serving in the case, surrender to the trustee all property of the estate and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title.

44. Exhibit 4, Joint Plan, § 7.7.